# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LOCAL 705 INTERNATIONAL BROTHERHOOD OF TEAMSTERS PENSION FUND, LOCAL 705 INTERNATIONAL BROTHERHOOD OF TEAMSTERS HEALTH AND WELFARE FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CENTRAL CONTRACTORS SERVICE, INC., <br><br> Defendant. | No. 17 C 1641 <br><br> Judge Jorge L. Alonso |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, the Local 705 International Brotherhood of Teamsters Pension Fund ("the Pension Fund"), the Local 705 International Brotherhood of Teamsters Health and Welfare Fund ("the Welfare Fund") (collectively, "the Funds"), and their trustees, bring this suit against defendant Central Contractors Service, Inc. ("CCS"), for unpaid contributions due to defendant's subcontracting certain bargaining-unit work to an outside firm. The parties have filed cross-motions for summary judgment. For the following reasons, defendant's motion is granted, and plaintiffs' motion is denied.

## BACKGROUND

CCS is a firm located in Crestwood and Alsip, Illinois, that leases, sells, and services large construction equipment, including cranes. (Joint Stipulations ("Jt. Stip.") ¶ 7, ECF No. 21; Pls.' LR 56.1 Resp. ¶ 1, ECF No. 29.) CCS has been party to a series of collective bargaining agreements ("CBAs") with Local 705 of the International Brotherhood of Teamsters ("Local

705"). (Jt. Stip. ¶ 8.) Each agreement required CCS to assign work to members of Local 705, as follows:

> **Article 2**
> **Work Coverage**
>
> This Agreement shall cover Building, Highway all other Construction work and all crane deliveries and movements originating in Cook, DuPage and all other Counties wherein Local No. 705 has jurisdiction as well as all crane movements made on any delivery site where the crane delivery originated in the aforementioned area.
>
> All work covered by the terms of this Agreement shall be performed exclusively by those classifications of employees specified in the Agreement. This shall be strictly enforced by the Employer and the Union. No one shall haul material except employees covered by this Agreement.

(Jt. Stip., Exs. 1-3.)

The Funds are "employee benefit funds" and "plans" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1391(a), (b), and they are "trust funds" within the meaning of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5), established according to their respective Trust Agreements to provide benefits to members of Local 705. (Jt. Stip. ¶¶ 1-2.) Under the CBAs, CCS was required to pay contributions to the Funds, at a prescribed weekly rate, for any week in which a bargaining-unit employee (*i.e.*, an employee who was a member of Local 705) performed work for CCS. (Def.'s LR 56.1 Resp. ¶ 9, ECF No. 32.)

In 2016, the Funds engaged an auditor to review CCS's payroll records for compliance with its contribution obligations for the period of October 1, 2011 through April 30, 2016. (*Id.* ¶ 20.) The auditor discovered that (1) CCS had neglected to make contributions on behalf of one of its employees, known as Bryan C., and (2) it had subcontracted work to Bil-Mac Express, Inc. ("Bil-Mac"), without making corresponding contributions to the Funds for Bil-Mac's work. (*Id.* ¶ 21; *see* Jt. Stip. ¶ 11.)

Bil-Mac, a trucking company in Arlington Heights, is not a party to a CBA with Local 705, nor is it required to make contributions to the Funds; instead, Bil-Mac is a party to a CBA with another Teamsters chapter, Local 710. (Def.'s LR 56.1 Resp. ¶¶ 23-24.) For at least the previous fifteen years, Bil-Mac handled CCS's "overflow" work, which means that, when CCS needed to transport a crane from one of its yards to a construction site or back again, but found itself short of manpower, equipment, or both, it would hire Bil-Mac to transport the crane. (Pl.'s LR 56.1 Resp. ¶¶ 7-11.) The auditor calculated that the work Bil-Mac performed for CCS was roughly equivalent to the work one full-time Local 705 employee might have performed (a reckoning that CCS disputes). (Def.'s LR 56.1 Resp. ¶ 33.) The Funds claim that prior audits did not reveal CCS's subcontracting relationship with Bil-Mac, although CCS disputes that claim, contending that they either knew or should have known of the relationship based on earlier audits. (Def.'s LR 56.1 Resp. ¶¶ 25-26.)

On September 22, 2016, Local 705 filed a grievance against CCS, arguing that it violated the CBA by subcontracting work to Bil-Mac without first holding a pre-job conference with the union. (Pl.'s LR 56.1 Resp. ¶ 20.) The Funds subsequently filed this lawsuit, asserting, in Count I, a claim under ERISA for the contributions CCS neglected to make on behalf of Bryan C.; and in Count II, a claim under the LMRA for the contributions CCS would have made on behalf of an employee assigned to perform the work it had subcontracted to Bil-Mac, if it had used one of its own employees instead of an outside contractor. After the filing of this suit, CCS promptly paid the contributions it had neglected to make on behalf of Bryan C. (Def.'s LR 56.1 Resp. ¶ 22), but it denies liability for any contributions relating to the work it subcontracted to Bil-Mac.

## ANALYSIS

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *see Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (court must enter summary judgment against a party who "'does not come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question'") (quoting *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). The Court construes all evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court applies these "ordinary standards for summary judgment" in the same way whether one or both parties move for summary judgment; when the parties file cross-motions, the Court treats each motion individually, "constru[ing] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017); *see Reeder v. Carter*, 339 F. Supp. 3d 860, 869-70 (S.D. Ind. 2018).

In support of their motion for summary judgment, plaintiffs argue that, by subcontracting with Bil-Mac, CCS breached its contractual obligation to use only Local 705 members to perform work covered by the CBAs, and therefore it is entitled to damages consisting primarily

4

of the Funds' lost contributions, plus liquidated damages, interest, and the cost of the audit, as well as attorneys' fees. In response and in support of its cross-motion for summary judgment, CCS argues that (1) it did not breach the CBAs, which permitted it to hire subcontractors under certain circumstances; and (2) even if it did breach the CBAs, lost contributions are not a proper measure of damages.[1]

## I. WHETHER THE CBA PERMITS SUBCONTRACTING

According to plaintiffs, Article 2 of each of the CBAs prohibits anyone from "haul[ing] material" for CCS apart from "employees covered by this Agreement." Plaintiffs admit there are two exceptions, but they argue that neither applies.

From at least 2009 to 2016, the CBAs between CCS and Local 705 contained the following provisions concerning subcontracting:

**Article 4**
**Subcontracting**

Section 1. The Employer agrees that it will not contract or subcontract work covered by this Agreement to be done at the construction site to any person, firm or corporation not a party to this Agreement.

Section 2. Any Employer who sublets to or who hires any other Employer to perform any work or services including the spreading on the construction site or the road bed of any stabilized base material to be used for subsurface which shall include but not limited to fill, Poz-O-Pac, aggregate materials, bituminous aggregate materials, cement aggregate materials, or any other trade name of base or paving materials, or the stockpiling of such materials, shall neither sublet nor hire any such Employers unless the employees of such Employers are paid an amount equal to the wages and fringe benefits being paid to employees working under this Agreement.

---

[1] CCS also argues that plaintiffs have waived and are estopped to assert any claim based on CCS's subcontracting with Bil-Mac because they did not object to the practice, which began no later than 2004, until 2016, despite twice auditing CCS's payroll records in the interim. The Court need not reach this issue because it grants CCS's motion on other grounds. Even if it were to reach the issue, it would not grant CCS's motion on this basis because CCS does not cite to any specific facts to establish that the Funds knew or should have known of its subcontracting with Bil-Mac, apart from the fact that the Funds regularly audited CCS's payroll records. While it certainly seems likely that whatever alarmed the Funds about CCS's subcontracting relationship with Bil-Mac in 2016 should have done the same at the time of the earlier audits in 2011 or 2008, CCS has not adduced sufficient evidence to permit the Court to so rule as a matter of law.

(Jt. Stip. Exs. 1-3.) Article 4, Section 1, prohibits subcontracting except for work "done at the construction site," and plaintiffs concede that the transportation of cranes to and from the construction site is not work "done at the construction site," so that exception does not apply to Bil-Mac's work.

The second exception, found in Article 4, Section 2, permitted CCS to hire another firm, or "Employer," to perform "any work or services including the spreading . . . of stabilized base material" on a construction site or road bed, so long as the "employees of such Employers are paid an amount equal to the wages and fringe benefits being paid to employees working under this Agreement." Plaintiffs argue that this section does not apply because CCS was not spreading base material on a construction site or road bed or anything of that nature; it was hauling a crane, an entirely different category of work.

Plaintiffs misread Section 2 and distort the role it, and Article 4 more broadly, play in the CBAs. As CCS correctly explains, Section 2 does not limit the type of work for which CCS may hire a subcontractor; rather, it states that, provided the subcontractor hires employees on terms and conditions no less generous than those set forth in the CBAs, CCS may hire the subcontractor to "perform ***any*** work or services ***including*** the spreading . . . of any stabilized base material." (Jt. Stip. Exs. 1-3 (emphasis added).) Plaintiffs read Section 2 as if it states that CCS may hire a subcontractor "to perform *only* work *that consists of* the spreading . . . of any stabilized base material," but that is not the language of the agreement. The CBAs use the term "including," and, giving the term a natural reading according to its ordinary meaning, the "use of "the word 'including' is intended to introduce examples of the general terms preceding it." *Darvosh v. Lewis*, 66 F. Supp. 3d 1130, 1135 (N.D. Ill. 2014) (citing, *inter alia*, *Paxson v. Bd. of Educ. of Sch. Dist. No. 87, Cook Cty., Ill.*, 658 N.E.2d 1309, 1314 (Ill. App. Ct. 1995) ("We . . .

find the word "including", in its most commonly understood meaning, to be a term of enlargement, not of limitation.")); *see also* Sutherland, *Statutory Construction*, § 47.25, Expressio unius est exclusion alterius ("The word 'include' in a statute generally signals that entities not specifically enumerated are not excluded") (citing, *inter alia*, *Bloate v. United States*, 559 U.S. 196, 206 (2010) ("including examinations" means that other "competency-related proceedings besides 'examinations'" are not excluded)). The "spreading" work that the section describes is merely an example of the type of work for which CCS may hire subcontractors; the section does not prohibit CCS from hiring subcontractors to transport cranes, so long as the subcontractor meets union standards for its employees' pay and benefits.

Reinforcing this reading of "including" as a term of enlargement, rather than limitation, is the interplay between Section 1 and Section 2 of Article 4. Section 1's restriction on subcontracting is necessarily limited because section 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(e), the statute's so-called "hot cargo" provision, generally "forbids a union and employer to agree that the employer will refuse to deal with another employer," including a "subcontractor," *United Rentals Highway Techs., Inc. v. Indiana Constructors, Inc.*, 518 F.3d 526, 528 (7th Cir. 2008), except where the employer is "in the construction industry" and its agreement "relate[s] to the contracting or subcontracting of work to be ***done at the site of the construction***," 29 U.S.C. § 158(e) (emphasis added). Thus, a straight prohibition on subcontracting work, other than work "done at the site of the construction," would be illegal.[2] In

---

[2] The Court notes that, even if plaintiffs had not conceded that the transportation and delivery of a crane to a construction site is not work "done at the construction site," the Court would have so ruled. The Seventh Circuit has explained that "[t]he distinction drawn by the exception is between workers at a construction site and workers who supply or deliver the building materials to the site but do not work there." *United Rentals*, 518 F.3d at 530 (citing decisions of the National Labor Relations Board ("NLRB")). "Delivery of materials to the worksite is not deemed 'work to be done at the site of construction.'" *The Developing Labor Law: The Board, the Courts, and the National Labor Relations Act*, 7th Ed., Ch. 23, "Section 8(E): The 'Hot-Cargo' Agreement." "Thus, the [NLRB] has found that the mixing, delivery, and pouring of ready-mix concrete, the delivery of precast concrete pipe, the transportation

7

its place, CBAs often include a union standards clause such as Article 4, Section 2 of the CBAs, which provides some protection for the union by limiting the employer's ability to circumvent the CBA by subcontracting with firms who compensate their employees less generously. *See George Ryan Co. v. NLRB*, 609 F.2d 1249, 1254 (7th Cir. 1979) ("'Union standards' clauses, which provide that an employer may subcontract only to other employers whose wage and working standards are commensurate with those in the union's collective bargaining agreement, have been justified as serving to remove an incentive for the employer to contract out work done by union employees."). Construing a union standards clause as broad in scope is logical because that construction serves the purpose of the CBA, *i.e.*, governing the employment relationship between the employer and union members; a contrary construction would, in many circumstances, permit the employer to subcontract around the CBA. Plaintiffs' proposed reading would limit the reach of Section 2 to "spreading" and like work, and the Court is not convinced that this interpretation is reasonable in light of the general purpose of a union standards clause.

Further, plaintiffs' argument, if accepted, would prove too much. If the union standards clause only applies to subcontracting involving "spreading" work, then that means that the CBA places *no* restrictions on the subcontracting of any other work not "done at the construction site." Plaintiffs seem to suggest that they need only show that Sections 1 and 2 of Article 4 do not apply to the Bil-Mac work because the CBA must expressly approve subcontracting, or it

---

of tools, materials, and personnel to and from a construction site, the delivery of sand fill, and the haulage of waste are not jobsite work." *Int'l Union of Operating Engineers (Steif Co. West)*, 314 NLRB 874, 877 (1994) (citing, *inter alia*, *Local 282, Teamsters (D. Fortunato)*, 197 NLRB 673, 678 (1972) ("The clause expressly covers the driving of delivery trucks as well as the driving of subcontractors' trucks bringing tool, materials, and personnel to and from the site of construction. Such driving work has consistently been held to be outside the proviso's protection.")). Even if there are certain tasks to be performed at a construction site upon pickup or delivery of certain equipment or materials, that does not bring the work within the "done at the construction site" proviso. *See Teamsters (Ind.) Local 294 (Island Dock Lumber, Inc.)*, 145 NLRB 484, 490-91 (1963) (mixing and pouring concrete according to specifications at construction site upon delivery "is merely the final act of delivery and does not come within the construction industry exemption").

presumptively prohibits it, but plaintiffs are incorrect; with respect to work that is not "done at the construction site," in light of section 8(e) of the NLRA, any presumption would have to run the opposite way. True, Article 2 of the CBAs seems to reserve all work within their scope for Local 705 members, but "[i]t is a well-settled principle of contract construction that where a contract contains both general and specific provisions relating to the same subject, the specific provision controls." *See Cent. States, Se., Sw. Areas Pension Fund v. George W. Burnett, Inc.*, 451 F. Supp. 2d 969, 981 (N.D. Ill. 2006) (citing *Carr v. Gates Health Care Plan,* 195 F.3d 292, 298 (7th Cir. 1999)); *see also Sprague v. Cent. States, Se. & Sw. Areas Pension Fund*, 143 F. Supp. 2d 948, 955 (N.D. Ill. 2001) (quoting *Diehl v. Twin Disc, Inc.,* 102 F.3d 301, 306 (7th Cir.1996)) ("Courts are to 'seek an interpretation that reconciles' potentially-conflicting provisions of a collective bargaining agreement, even if 'this may compel a rather forced construction.'"). Plaintiffs must point to language in the CBA that prohibited CCS from subcontracting with Bil-Mac, rather than an absence of language expressly permitting it, and establishing that the union standards clause does not apply would not accomplish this.

Ultimately, because the union standards clause of Article 4, Section 2 is applicable, the question is whether Bil-Mac compensated its employees according to Local 705's standards by providing the same level of pay and benefits. The record reveals no specific facts about Bil-Mac's employees' pay and benefits. CCS argues that they must have been at least as generous as CCS's, not only because Bil-Mac also operated under a CBA with the International Brotherhood of Teamsters (albeit a different local chapter), but also because it billed CCS at a rate of $85 per hour, which is more than CCS's hourly cost of $79.54 per hour to perform the same work. (*See* Pl.'s LR 56.1 Resp. ¶ 14.) But Bil-Mac's billing rate to CCS proves nothing about its employees' wages and benefits, nor does CCS provide any authority for making any inferences

based on Bil-Mac's billing rate or its CBA with Teamsters Local 710. There is no evidence in the record that would permit a factfinder to draw any reasonable conclusion either way as to whether Bil-Mac's employees' pay and benefits matched CCS's.

But under such circumstances, CCS prevails. It has discharged its burden under Rule 56 to show that "there is an absence of evidence to support the nonmoving party's case" on "an issue on which the nonmoving party bears the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see Trs. of Chi. Plastering Inst. Pension Tr.*, 570 F.3d 890, 896-97 (7th Cir. 2009) (affirming trial court decision reasoning that employer's failure to keep records that pension fund could have used to carry its burden of proof did not relieve pension fund of its burden on the issue); *Gen. Warehousemen's Union Local 852, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Reliance Elec. Co.*, 386 F. Supp. 1303, 1307 (S.D.N.Y. 1973) ("In a suit . . . charging breach of a duty created by collective bargaining agreement, it is plaintiff's burden to prove, by a fair preponderance of the credible evidence, that defendant breached the collective bargaining agreement."); *Lodge 743, Int'l Ass'n of Machinists, AFL-CIO v. United Aircraft Corp.*, 299 F. Supp. 877, 890 (D. Conn. 1969) ("The burden of proof rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the action is concluded."). Alternatively, plaintiffs have waived any argument based on the compensation of Bil-Mac's employees by failing to raise it in their response brief. (*See* Pl.'s Resp. in Opp'n at 3-4, ECF No. 28.) *See Merry Gentleman, LLC v. George & Leona Prods., Inc.*, 76 F. Supp. 3d 756, 761 (N.D. Ill. 2014) (failure to make an argument in response to a motion for summary judgment forfeits the argument). As the plaintiffs in this case, the Funds have the burden of establishing that CCS breached its contract, and they have not developed evidence sufficient to permit a reasonable jury to conclude that CCS

breached the CBAs by subcontracting with a firm whose employees earn less in pay and benefits than CCS's own employees.

## II. DAMAGES

Even if the Court were to agree with plaintiffs that CCS breached the CBAs by subcontracting with Bil-Mac, plaintiffs have not proven their damages by any valid measure. Plaintiffs principally seek the contributions that CCS would have made to the Funds if CCS directed an employee to perform the work that it hired Bil-Mac to do, arguing that the Seventh Circuit awarded such damages in analogous circumstances in *Chicago Painters & Decorators Pension, Health & Welfare & Deferred Savings Plan Trust Funds v. Karr Brothers*, 755 F.2d 1285, 1288-89 (7th Cir. 1985).

But plaintiffs are incorrect because the circumstances of *Karr Brothers* were not strictly analogous. In *Karr Brothers*, the collective bargaining agreement prohibited *all* subcontracting. *See id.* at 1287 ("Article XI, Section 1, provided: 'Employer agrees that he will not sublet any work to any Employee.'"). In other words, the employer could not properly assign *any* work covered by the collective bargaining agreement to anyone other than a member of the bargaining unit without violating the agreement. Under those circumstances, awarding the plaintiff funds the contributions the employer would have paid if it had assigned the work to a member of the bargaining unit was a proper remedy because it "comports with the principle that breach of contract damages should place the aggrieved party in the place he would have been in had the breach not occurred." *Id.* at 1290. But in this case, the CBAs permitted subcontracting under certain circumstances, and no language in the CBAs required CCS to pay contributions on behalf of subcontractors. Under such circumstances, the reasoning of *Karr Brothers* does not apply

because "the Funds would have been in a different place had the breach not occurred, because they would not have been entitled to contributions even if [the employer] had not breached the [CBA]," *i.e.*, even if the employer had properly hired qualified subcontractors according to the terms of the union standards clause. *Woldman v. Cty. Line Cartage, Inc.*, No. 01 C 9414, 2003 WL 22995161, at *6 (N.D. Ill. Dec. 16, 2003) (distinguishing *Karr Brothers* on this basis). Under these circumstances, the damages plaintiffs seek are speculative at best, and at worst a "windfall" to plaintiffs. *See id.* The Court agrees with defendant that plaintiffs have not proven their damages, and defendant is therefore entitled to summary judgment.

Plaintiffs also argue that CCS should pay their attorneys' fees and other costs of collection, as required by the Funds' trust agreements and by ERISA, 29 U.S.C. § 1132(g)(2)(D). Because plaintiffs have not shown any genuine, material dispute as to whether the unpaid contributions they seek in this action are "moneys due" under the CBAs, as the trust agreements require, and the Court has not awarded them in a "judgment," as ERISA requires, plaintiffs are not entitled to attorneys' fees and costs.

## CONCLUSION

For the reasons set forth above, the Court grants defendant's motion for summary judgment [25] and denies plaintiffs' motion for summary judgment [22]. Civil case terminated.

SO ORDERED.                                    ENTERED: March 14, 2019

_____
**HON. JORGE ALONSO**
**United States District Judge**